IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| RONALD DALLAS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil No. 11-116-CJP |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

### MEMORANDUM and ORDER

**PROUD, Magistrate Judge:**

In accordance with 42 U.S.C. § 405(g), plaintiff Ronald Dallas is before the Court, represented by counsel, seeking review of the final decision of the Commissioner of Social Security denying him Disability Insurance Benefits (DIB) Benefits.[1]

### Procedural History

Mr. Dallas applied for benefits in February, 2007, alleging disability beginning on November 15, 2004. (Tr. 91). The application was denied initially and on reconsideration. After holding a hearing, ALJ Thomas C. Muldoon denied the application for benefits in a decision dated January 30, 2009. (Tr. 14-29). Plaintiff's request for review was denied by the Appeals Council on January 7, 2011, and the decision of the ALJ became the final agency decision. (Tr. 1).

Administrative remedies have been exhausted and a timely complaint was filed in this Court.

### Issues Raised by Plaintiff

Plaintiff raises the following issues:

---

[1] This case was referred to the undersigned for final disposition upon consent of the parties, pursuant to 28 U.S.C. §636(c). See, Doc. 12.

1. The ALJ's assessment of his RFC was not supported by substantial evidence because of errors in the evaluation of the medical evidence.

2. The assessment of plaintiff's RFC was "conclusory."

3. The ALJ's use of the Grids instead of a vocational expert was erroneous where plaintiff had significant non-exertional limitations.

## **Applicable Legal Standards**

To qualify for DIB, a claimant must be disabled within the meaning of the applicable statutes. For these purposes, "disabled" means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." **42 U.S.C. §§ 423(d)(1)(A) and 1382c(a)(3)(A).**

A "physical or mental impairment" is an impairment resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques. **42 U.S.C. §§ 423(d)(3) and 1382c(a)(3)(C).** However, limitations arising from alcoholism or drug use are excluded from consideration of whether a claimant is disabled. **42 U.S.C. §423(d)(2)(C); 20 C.F.R. §404.1535.**

"Substantial gainful activity" is work activity that involves doing significant physical or mental activities, and that is done for pay or profit. **20 C.F.R. §§ 404.1572.**

Social Security regulations set forth a sequential five-step inquiry to determine whether a claimant is disabled. The Seventh Circuit Court of Appeals has explained this process as follows:

> The first step considers whether the applicant is engaging in substantial gainful activity. The second step evaluates whether an alleged physical or mental impairment is severe, medically determinable, and meets a durational requirement. The third step compares the impairment to a list of impairments that are considered conclusively disabling. If the impairment meets or equals one of the listed impairments, then the applicant is considered disabled; if the impairment does not meet or equal a listed impairment, then the evaluation continues. The fourth step assesses an applicant's residual functional capacity (RFC) and ability to engage in past relevant work. If an applicant can engage in past relevant work, he is not disabled. The fifth step assesses the applicant's RFC,

as well as his age, education, and work experience to determine whether the applicant can engage in other work. If the applicant can engage in other work, he is not disabled.

**Weatherbee v. Astrue, 649 F.3d 565, 568-569 (7th Cir. 2011).**

Stated another way, it must be determined: (1) whether the claimant is presently unemployed; (2) whether the claimant has an impairment or combination of impairments that is serious; (3) whether the impairments meet or equal one of the listed impairments acknowledged to be conclusively disabling; (4) whether the claimant can perform past relevant work; and (5) whether the claimant is capable of performing any work within the economy, given his or her age, education and work experience. **Schroeter v. Sullivan, 977 F.2d 391, 393 (7th Cir. 1992); see also, 20 C.F.R. §§ 404.1520(b-f).**

This Court reviews the Commissioner's decision to ensure that the decision is supported by substantial evidence and that no mistakes of law were made. The scope of review is limited. "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ." **42 U.S.C. § 405(g)**. Thus, this Court must determine not whether Mr. Dallas was, in fact, disabled during the relevant time period, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made. **See, Books v. Chater, 91 F.3d 972, 977-78 (7th Cir. 1996)** (citing **Diaz v. Chater, 55 F.3d 300, 306 (7th Cir. 1995)**).

This Court uses the Supreme Court's definition of substantial evidence, i.e, "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." **Richardson v. Perales, 402 U.S. 389, 401 (1971).**

In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court does <u>not</u> reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ. **Brewer v. Chater, 103 F.3d 1384, 1390 (7th Cir. 1997)**. However, while judicial review is deferential, it is not abject; this Court

3

does not act as a rubber stamp for the Commissioner.  **See,** ***Parker v. Astrue***, 597 F.3d 920, 921 (7th Cir. 2010), and cases cited therein.

### The Decision of the ALJ

ALJ Muldoon followed the five-step analytical framework described above. He determined that Mr. Dallas had not engaged in substantial gainful activity since the alleged onset date, and that he was insured for DIB through December 31, 2009.  He determined that Mr. Dallas had severe impairments of L4-5 bulging disc with lumbar radiculopathy, cervical disc protrusion/spondylosis with right cervical radiculopathy, tremor of the dominant right arm and headaches.

The ALJ found that plaintiff's testimony was not entirely credible.  Plaintiff has not challenged that finding.

The ALJ determined that Mr. Dallas had the residual functional capacity to perform a full range of work at the light exertional level.  Relying on the *Dictionary of Occupational Titles*, the ALJ found that plaintiff was able to perform his past relevant work as a Slitting Machine Coiler as it is generally performed in the national economy.  The ALJ made an alternative finding at step 5 by applying the Medical-Vocational Guidelines (the "Grids") (20 C.F.R. Pt. 404, Subpt. P, App. 2), which directed a conclusion of "not disabled."

### The Evidentiary Record

The Court has reviewed and considered the entire evidentiary record in formulating this Memorandum and Order.  The following summary of the record is directed to the points raised by plaintiff.  As plaintiff has not challenged the finding that he did not have a severe mental impairment, the Court will not summarize the evidence related to his alleged mental impairment in any detail.

1. **Agency Forms**

4

Mr. Dallas was born in June, 1965, and was 39 years old when he allegedly became disabled. (Tr. 124). Plaintiff had worked as a clerk and as a laborer in factories and warehouses. He had worked as a machine operator in a slit house. (Tr. 128-136). He graduated from high school. (Tr. 150).

In a Disability Report, plaintiff said that he was off work following an industrial accident in January, 2004. He was released to return to work with restrictions in August, 2004, but he was terminated because of his condition in November, 2004. (Tr. 143). In 2004, he was working at a Kraft factory, issuing parts from the storeroom. (Tr. 129).

## 2. Evidentiary Hearing on October 14, 2008

Plaintiff was represented by an attorney at the hearing. (Tr. 30).

Mr. Dallas was the only witness. He was 43 years old at the time of the hearing. He was 5'9" tall and weighed 174 pounds. He lived with his wife and 13 year old son. (Tr. 33-34). His last full-time job was as a parts clerk at Kraft/Capri Sun. That job ended when he was terminated in 2004. (Tr. 35). Before that, he worked as a machine operator. (Tr. 35-36).

Plaintiff testified that he was unable to work because of pain and stiffness in the right side of his body, including his ankle, knee, biceps, wrist, neck and head. His condition was caused by a work accident. (Tr. 37). He had tremors in his right arm. Activities such as bending, stooping, twisting, turning and walking for prolonged periods increased his pain. (Tr. 38). Looking up caused a sharp pain behind his right eye. (Tr. 39). Standing or walking caused him pain in his right knee, which went up his right side. His neck hurt when he walked. Sitting for an hour caused him to get stiffness in his right side. (Tr. 40).

Mr. Dallas said that he had tremors in his right hand which interfered with his grip. He was taking medication, which helped. (Tr. 43).

3.     **Medical Records**

Mr. Dallas' primary care physician was Dr. Robert Blankenship. Plaintiff saw Dr. Blankenship on March 10, 2004, for an on-the-job injury. Plaintiff told the doctor that a door hit him in the face, causing him pain in his neck and numbness in his right hand. He had headaches and muscle spasms in his neck. The company physician had told him it was a "muscle type injury." Dr. Blankenship diagnosed torticollis and referred him to a chiropractor, Dr. King.[2]

On March 13, 2004, an MRI of the cervical spine showed a minimal C5-6 disc protrusion which "appears chronic and is unlikely to be of clinical significance." (Tr. 338).

Dr. David Kennedy, a neurologist, performed an independent medical examination, evidently in connection with plaintiff's workers compensation claim. Dr. Kennedy noted a history of having been hit in the head when a gate recoiled on January 19, 2004. Plaintiff had been working as a storeroom clerk at a Kraft/Capri Sun plant. Mr. Dallas complained of pain at the base of the neck with radiating pain into the right arm. An EMG study was normal, and an MRI of the cervical spine showed mile prolapse at C5-6 with no cord or root impingement. Dr. Kennedy diagnosed a cervical strain which did not require surgical treatment. He recommended trigger point injections to reduce pain and allow for more vigorous rehabilitation. He recommended that , in the interim, plaintiff not lift more than 20 pounds or do more than occasional overhead lifting. (Tr. 361-363).

In August of 2004, Dr. Blankenship noted that Mr. Dallas was receiving therapy from Dr. King's office and was somewhat improved. He had developed a tremor in the right arm which was being treated with Primidone, and he now had "practically no further tremors." Dr. Blankenship noted that he was cleared for light duty. (Tr. 209).

---

[2] "Torticollis is a twisted neck in which the head is tipped to one side, while the chin is turned to the other." See, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0001757/, accessed on October 30, 2012.

In May, 2004, plaintiff began treating with Dr. Syed Ali at Tri-City Neurology. (Tr. 396). An MRI of the head was normal in June, 2004. An EMG/nerve conduction study showed relatively slower right ulnar velocity and tremor. (Tr. 316-317). In July, 2004, Dr. Ali noted that his tremor was better. He had no side effects from Primidone (Mysoline). (Tr. 390). In August, 2004, Dr. Ali noted that he could not do light duty "due to employer reluctance." The assessment was tremor, status post head injury and cervical radiculopathy. (Tr. 389). Dr. Ali recorded that plaintiff was back to work in September, 2004, but he was "suspended from work" in November, 2004. (Tr. 384-386).

In February, 2005, Dr. Blankenship noted that his tremor had not been well-explained, but had improved on Primidone. He had "no other complaints." (Tr. 207). In May, 2005, Dr. Blankenship noted that Mr. Dallas was being seen by a neurologist and was taking a muscle relaxer for his back. He denied headaches and said he felt well. (Tr. 206).

In April, 2005, plaintiff complained to Dr. Ali of low back pain. (Tr 381). An MRI of the lumbar spine showed a central disc bulge at L4-5 with no significant bony or soft tissue impingement on canal or foramina. (Tr. 308). In May, 2005, Dr. Ali noted that plaintiff was trying to start a janitorial business. (Tr. 378).

Dr. Ali recommended trigger point injections for neck pain, but there was a question as to whether this would be authorized by the workers compensation insurance carrier. (Tr. 374). In March, 2006, on exam, Dr. Ali found decreased range of motion of the neck and collapsing of the right upper extremity with no tremor noted. He recommended pain management. Plaintiff was looking into a chauffeur job, but said that driving increased his pain. (Tr. 373). In June, 2006, according to Dr. Ali, plaintiff felt better temporarily after cervical and lumbar injections. He did not get the job that he had been hoping for. (Tr. 370).

Mr. Dallas was treated by a pain management specialist, Dr. Gunapooti. From April to

October, 2006, Dr. Gunapooti gave him a series of epidural steroid block injections in the lumbar and cervical areas. According to Dr. Gunapooti's notes, Mr. Dallas experienced significant or good relief of his pain for a period of time. (Tr. 398-409). On October 18, 2006, his chief complaint was low back and right hip pain. Dr. Gunapooti noted that his neck pain was "resolved." On exam, he had full range of motion of the cervical and lumbar spine, but it was painful. On palpation, the doctor detected slight tenderness over the cervical paraspinal region. Straight leg raising was negative. Motor strength in the upper and lower extremities was 5/5 in all muscle groups. Sensory testing was normal. The doctor recommended an x-ray of the left hip, and advised him to continue his home exercise program and to use Robaxin as needed for spasms. (Tr. 406).

David T. Volarich, D.O., performed an independent medical examination of plaintiff on October 25, 2006. (Tr. 411-419). This was evidently done in connection with his workers compensation claim. On examination, Dr. Volarich found that strength in the right arm was reduced at 3/5, and there was a resting tremor in the right forearm, wrist and hand. He had normal sensation in the upper extremities, but reduced sensation to pinprick in stocking distribution in the lower extremities. Range of motion was reduced in the cervical and lumbar spine. (Tr. 414-415). Dr. Volarich opined that plaintiff was able to work with the following limitations:

- limit repetitive bending, twisting, lifting, pushing, pulling, carrying, climbing and similar tasks to an "as needed" basis;

- no handling weight greater than 20 pounds, and limit "this task" to an occasional basis;

- no handling weight over his head or way from his body;

- no carrying weight over long distances or uneven terrain;

- avoid remaining in a fixed position (sitting or standing) for more than 60 minutes;

8

and
- change positions frequently.

Dr. Volarich also recommended that he pursue a stretching, strengthening and range of motion exercise program in addition to non-impact aerobic conditioning. (Tr. 418).

Dr. Raymond Leung performed a consultative physical examination in connection with plaintiff's application for social security benefits on April 25, 2007. (Tr. 420-424). Mr. Dallas complained of head and neck pain. He said that he had a bulging disc in his neck. He told Dr. Leung that he had steroid injections "which have not helped." He said that pain went down his right arm and his fourth and fifth fingers were numb. He said he had occasional trouble grabbing thing with his hands, his right arm and right leg are weak, and he may have tremors on his right side. He was taking Primidone and Hydrocodone. On physical exam, Dr. Leung found that his gait was normal and he was able to walk 50 feet unassisted. He could not heel walk, but was able to toe walk and squat. He had occasional moderate tremors in his right arm and hand. He had significant difficulty picking up a penny due to tremors. He had a full range of motion of the lumbar spine. He had decreased range of motion of his neck. His right arm, leg and grip strength were reduced to 4+/5. He had decreased sensation to light touch in the right fourth and fifth fingers.

The next medical treatment was on August 6, 2007. Dr. Gunapooti gave plaintiff a cervical epidural steroid injection. He reported good relief of pain, but he still had throbbing pain over his right biceps. (Tr. 454). In March, 2008, Dr. Gunapooti did two selective nerve root blocks at L4-5. Plaintiff reported "at least 50% relief of pain." (Tr. 452-453).

Dr. Gunapooti ordered a cervical MRI, which was done on March 6, 2008. This study showed "very mild degenerative disc disease at C5-6 and C6-7 without significant central canal or neural foraminal stenosis." (Tr. 446).

Plaintiff saw Dr. James Lu, a neurosurgeon, on April 4, 2008. Dr. Lu found that he had point tenderness in the right upper paraspinous region and limitation of range of motion of the cervical spine. He had "give-way type weakness of the right triceps and deltoid secondary to pain." Otherwise, his strength was full at 5/5 throughout. He had a resting tremor that worsened with intention in the right arm and leg. He had diminished sensation in the fourth and fifth finger on the right, extending into the palm and forearm. Dr. Lu reviewed the MRI from March 6, 2008, and noted that there was "no clear anatomic correlate" for his symptoms based on the results of the MRI. He recommended that Mr. Dallas continue conservative management for his neck pain and follow up with his neurologist. (Tr. 436-438).

On April 10, 2008, Mr. Dallas told Dr. Blankenship that cervical and lumbar steroid injections had given him "minimal improvement." On exam, he had mild limitation of motion and some tenderness of his posterior neck. He said that he had "tremors with increased inactivity of his right upper extremity." (Tr. 462).

Mr. Dallas continued to be treated by Dr. Gunapooti. On April 24, 2008, she recommended cervical facet medial branch block for diagnostic and therapeutic response, and subsequent radiofrequency ablation (rhizotomy). (Tr. 441).

Dr. Gunapooti's last note is dated July 17, 2008. The chief complaint was chronic neck pain - decreasing. The secondary complaint was chronic low back pain and right leg pain in L4-5 distribution - under control. Mr. Dallas reported "at least 70-80% relief of pain from the previous facet blocks." On exam, he had full range of motion of the cervical and lumbar spine, with pain, and slight tenderness over the lumbar/cervical paraspinal region. He also had tenderness at the mid-trapezius region. Straight leg raising was negative, and motor strength in the upper and lower extremity was 4+/5. Dr. Gunapooti noted that Mr. Dallas was "pleased with the amount of pain relief with cervical facet blocks," except for the mid-trapezius region. She

recommended trigger point injections. (Tr. 440).

4.      **State Agency Consultant RFC Assessment**

State agency consultant Richard Bilinsky, M.D., assessed plaintiff's residual functional capacity (RFC) based on a review of medical records on May 14, 2007. (Tr. 425-432). He opined that plaintiff was able to perform the exertional requirements of light work , i.e., occasionally lift 20 pounds, frequently lift 10 pounds, stand/walk for 6 out of 8 hours, sit for 6 out of 8 hours, with unlimited ability to push and/or pull with upper and lower extremities. He acknowledged that plaintiff complained of pain in his right arm and numbness in his fingers, and that he had difficulty with fine manipulations with his right hand due to tremor. Dr. Bilinsky opined that Mr. Dallas had manipulative limitations such that he was restricted to only occasional fingering and feeling with his right hand. Occasional is defined in the RFC Assessment form as "occurring from very little up to one-third of an 8-hour workday." (Tr. 425). He assessed no postural limitations.

A second state agency consultant reviewed the file and agreed with the above assessment on October 15, 2007. No additional records had been submitted since Dr. Bilinsky's review. (Tr. 434-435).

## Analysis

Plaintiff first argues that the ALJ's assessment of his RFC is not supported by substantial evidence because it relied on Dr. Bilinsky's assessment, but the ALJ failed to adequately explain why he omitted a limitation to only occasional fingering and feeling with the right hand. He is correct, and this point is dispositive.

The ALJ determined that Mr. Dallas was able to perform a full range of light work, with no non-exertional limitations. Tr. 19. He acknowledged that Dr. Bilinsky and a second state agency consultant limited plaintiff to only occasional fingering and feeling with the right hand,

11

Tr. 23, and said that his own RFC assessment was "generally consistent" with the state agency consultants' assessment, Tr. 26, but he neglected to adequately explain why he rejected the doctors' opinions that Mr. Dallas was limited to only occasional fingering with the right hand.

Although he did not relate it explicitly to his weighing of Dr. Bilinsky's opinion, ALJ Muldoon did discuss plaintiff's tremors. He observed that the medical records indicated that plaintiff's tremors were intermittent, and "mostly under control with medication." He also observed that his tremors did not prevent him from daily activities such as driving, and "would not interfere with work activities except those such as watch assembly or calligrapher, which require extremely steady hands." He then went on to say that "this limitation is not a significant limitation on the full range of light work." (Tr. 25).

ALJ Muldoon did not explain why he rejected the limitation to occasional fingering and feeling with the right hand, in view of his apparent acceptance of the proposition that Mr. Dallas had intermittent tremors in his right arm. The ALJ offered no explanation for why a limitation on fingering and feeling was not warranted for a claimant with at least intermittent tremors in the right arm.

State agency consultants such as Dr. Bilinsky "are highly qualified physicians . . . who are experts in the evaluation of the medical issues in disability claims under the Act." SSR 96-6p, at 2. 20 C.F.R. §404.1527(f) requires an ALJ to consider the state agency physicians' findings of fact about the nature and severity of the claimant's impairment as opinions of non-examining physicians; while the ALJ is not bound by the opinion, he may not ignore it either, but must consider it and explain the weight given to the opinion in his decision. *Id.*

In rendering his decision, ALJ must "confront evidence that does not support his conclusion and explain why it was rejected." **Indoranto v. Barnhart, 374 F.3d 470, 474 (7th Cir. 2004).** He cannot simply selectively discuss medical opinions, ignoring the parts that

conflict with his RFC assessment.  *Myles v. Astrue*, 582 F.3d 672, 678 (7th Cir. 2009). *Godbey v. Apfel*, 238 F.3d 803, 808 (7th Cir. 2000).   "If a decision 'lacks evidentiary support or is so poorly articulated as to prevent meaningful review,' a remand is required." *Kastner v. Astrue*, ___ F.3d ___, 2012 WL 4799021, * 3 (7th Cir. 2012), citing *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002).

      The Commissioner's argument focuses on justifying the ALJ's rejection of Dr. Volarich's opinion, which was more restrictive than Dr. Bilinsky's.  He does not explicitly address the ALJ's rejection of Dr. Bilinsky's opinion that Mr. Dallas is limited to only occasional fingering and feeling with the right hand.  In the course of his argument regarding Dr. Volarich, he does argue that the ALJ "did not ignore the concerns about the tremors causing limited fine finger dexterity."  Doc. 27, p. 9.  In making this argument, however, the Commissioner misstates the record; the Commissioner asserts that Dr. Leung found on examination that "Mr. Dallas could pick up a penny from a table with his right hand."  *Ibid*.  This is incorrect.  In fact, Dr. Leung observed that Mr. Dallas "had significant difficulties picking up a penny from the table with his RT hand due to his tremors."  (Tr. 421).

      The ALJ apparently gave scant consideration to whether Mr. Dallas was limited in his ability to finger because he believed, incorrectly, that a limitation on fingering ability was not relevant to the ability to do a full range of light work.  He concluded his brief discussion of plaintiff's tremor and fingering ability with a statement that a limitation on fingering "is not a significant limitation on the full range of light work, which mostly does not require fine fingering (SSR 83-10)."  (Tr. 25).  The Commissioner echoes this statement in his brief, arguing that "limited fine finger dexterity" does not "significantly impact the number of light jobs available."  Doc. 27, p. 11.  Both the ALJ and Commissioner are reading too much into SSR 83-10, and ignoring the actual requirements of plaintiff's past relevant work.

13

SSR 83-10 addresses the use of the Grids in determining disability. It describes the general requirements of work at each exertional level. SSR 83-10 explains that "Most unskilled sedentary jobs require good use of the hands and fingers for repetitive hand-finger actions." However, unskilled light jobs "require use of arms and hands to grasp and to hold and turn objects, and generally do not require use of the fingers for fine activities to the extent required in much sedentary work." SSR 83-10, 1983 WL 31251, *5-6. In other words, light work does not require the ability to finger as much as sedentary work does. It is an overstatement to conclude, as the ALJ did, that light work "mostly does not require fine fingering." (Tr. 25).

Clearly, some light work does require ability to finger to some extent. The ALJ concluded that Mr. Dallas was able to do his past relevant work as a Slitting-Machine Coiler, DOT [*Dictionary of Occupational Titles*] code 613.685-010. (Tr. 26). However, according to the DOT, that job, while generally performed at the light exertional level, requires frequent fingering. *Dictionary of Occupational Titles*, 613.685-010, 1991 WL 684984. The DOT defines frequent as occurring from 1/3 to 2/3 of the time, which is consistent with the agency's definition. See, SSR 83-10, 1983 WL 31251, *5-6. If, as Dr. Bilinsky found, Mr. Dallas was limited to only occasional fingering, he would not have been able to do his past relevant work as it is described in the DOT.

In sum, the ALJ failed to adequately explain why he rejected the opinion of the state agency consultants that plaintiff was limited to only occasional fingering, and he erred as a matter of law in concluding that the ability to finger is not relevant to the ability to do light work in general, or to do plaintiff's past work. Therefore, this case must be remanded.

The Court wishes to stress that this Memorandum and Order should not be construed as an indication that the Court believes that Mr. Dallas is disabled or that he should be awarded benefits. On the contrary, the Court has not formed any opinions in that regard, and leaves those issues to be determined by the Commissioner after further proceedings.

## Conclusion

The Commissioner's final decision denying Ronald Dallas' application for social security disability benefits is **REVERSED and REMANDED** to the Commissioner for rehearing and reconsideration of the evidence, pursuant to sentence four of **42 U.S.C. §405(g).**

The Clerk of Court is directed to enter judgment in favor of plaintiff.

**IT IS SO ORDERED.**

**DATED:  November 1, 2012.**

s/ Clifford J. Proud
**CLIFFORD J. PROUD**
**United States Magistrate Judge**